# Ferguson v. McKiernan

354

C.P. of Dauphin County, no. 1259 DR 1999.

*Elizabeth Hoffman,* for plaintiff.
*John Purcell Jr.,* for defendant.

EVANS, *J.,* December 31, 2002—This unusual action arose when plaintiff filed for child support claiming that the defendant was the putative father of the twin boys plaintiff gave birth to on August 25, 1994. On February 7, 2000, defendant filed preliminary objections in the nature of a demurrer arguing that at the time the children were conceived, the plaintiff was married to her then husband, Paul S. Ferguson. Defendant also argued that Mr. Ferguson was named as the father on the birth certificates and that the plaintiff gave the children his last name, thus invoking the presumption that Mr. Ferguson was the natural father of the children. Plaintiff counterargued that at the time of conception, plaintiff was married but had been separated from her husband for almost one year. The children were conceived through in vitro fertilization on February 14, 1994, the same date that

Mr. Ferguson filed for divorce from plaintiff. The divorce was finalized on June 27, 1994. There was no testimony that Mr. Ferguson ever held himself out as the father of the twins, nor that he accepted such role.

On November 9, 2000, a hearing was held in which the court determined the plaintiff had overcome the presumption that Mr. Ferguson was the natural father of the children. N.T. 11/9/00 at 73. At that time, defendant denied paternity. *Id.* at 76. Defendant submitted to DNA testing that concluded defendant could not be excluded as the children's biological father.[1] On August 20, 2001, an appeal was heard on the Dauphin County Domestic Relations' determination. The record was kept open for a supplemental hearing on March 7, 2002. For the following reasons, we hold that the defendant is the legal father of the children and must therefore pay child support insofar as he directly and knowingly brought them into this world. This opinion, however, does not address any cause of action for indemnification by the plaintiff herself.

Our decision is conditioned on the extremely convoluted facts of this case. Plaintiff and defendant met in 1990 and were co-workers at Pennsylvania Blue Shield. N.T. 8/20/01 at 8. The parties began a physical relationship in 1991 while maintaining separate residences during the relationship. *Id.* During the course of their relationship, plaintiff and defendant broke up several times

---

1. The troublesome aspect of this opinion is that the record, and the findings of this court, are that the plaintiff's actions of fraud, deceit, lies and misrepresentations lulled this sperm donor into paternity and his concomitant financial responsibilities.

before getting back together. *Id.* at 10. The defendant never used condoms during intercourse because plaintiff cajoled defendant that she was using a new form of birth control, the Norplant device, which required having a metal pin inserted into her arm. *Id.* at 14. Plaintiff also revealed to defendant's brother she was using some method of birth control that did not involve the use of birth control pills. *Id.* at 106. During the relationship, however, plaintiff never enlightened defendant of the fact that plaintiff had a tubal ligation following the birth of her second child, thus rendering her sterile. *Id.* at 15.

During the summer of 1993, their relationship waned as their affection began to dwindle. *Id.* However, plaintiff first raised with defendant the possibility of conceiving a child with him. *Id.* at 18. Defendant immediately declined to conceive a child through intercourse despite his unawareness of plaintiff's inability to do so. *Id.* Later in 1993, plaintiff then requested that defendant donate his sperm for purposes of artificial insemination, thus removing him as a natural, biological father, but rather as a sperm donor. *Id.* Defendant, reluctant at first, agreed to do so after being assured by plaintiff that she had thoroughly considered being a single mother and that she had sufficient financial resources to raise a child on her own. *Id.* at 19. Both parties entered into an oral contract where defendant would purely be an anonymous sperm donor, to everyone except the plaintiff, provided that he would have no responsibility to any children born from the procedure. *Id.* Moreover, defendant would have no rights to the children, nor would he be obligated to financially support them. *Id.* at 20.

Earlier in 1993, plaintiff consulted with her physician about having her tubal ligation reversed. N.T. 11/9/00 at 15-17. However, in September 1993, after being informed the ligation could not be reversed, plaintiff spoke with Dr. William Dodson at the Hershey Medical Center about becoming pregnant using the IVF procedure. *Id.* at 19. At that meeting, it was represented to the hospital that the man accompanying the plaintiff was her husband, Mr. Ferguson.[2] In fact, the testimony indicates that the defendant was unaware of these preliminary consultations. Numerous papers, charts, and forms were completed without the defendant's knowledge or presence. This latent subterfuge by the plaintiff is the cornerstone of the defendant's position. Clear to this court as it is, we hinge our decision on a different legal axiom.

The plaintiff was then accepted as a candidate for IVF. On February 14, 1994, pursuant to the parties' agreement, the defendant went to Hershey Medical Center and provided a sample of his semen which was then used by Dr. Dodson to successfully impregnate plaintiff. The procedure resulted in the conception of twin boys who were born prematurely on August 25, 1994. At no time did defendant bear any of the costs related to the procedure. N.T. 8/20/01 at 27.

Defendant remained friends with plaintiff during her pregnancy although he never attended any of her prenatal examinations. *Id.* at 32. Defendant intended to remain

---

2. It was noted that the individual who accompanied the plaintiff was an African-American matching the description of her husband. The defendant herein is a Caucasian. Apparently, the hospital never noticed this inconsistency.

anonymous during plaintiff's pregnancy. However, defendant's brother noticed plaintiff's pregnant condition and plaintiff stated that defendant was the father. *Id.* at 112. Defendant's brother subsequently confronted defendant and defendant admitted to being the donor. *Id.* at 24. Defendant also admitted to his parents that he was the donor after they received anonymous phone calls. *Id.* at 25.

The plaintiff subsequently went into premature labor and was frantic over the possibility of losing the twins. *Id.* at 33. In a panic, plaintiff called defendant and asked him to attend the birth, which defendant did because he believed plaintiff could turn to no one else. *Id.* at 34. During the birth, defendant maintained his anonymity and did not represent himself as the father. *Id.* In continuing her misrepresentation to the hospital, the plaintiff named Paul Ferguson as the father on the birth certificates. *Id.* at 35.

After the twins were born, defendant saw plaintiff and the boys on a few occasions in the hospital. *Id.* at 37. Approximately two years after the births, defendant spent an afternoon with plaintiff and the twins while visiting his parents in Harrisburg. *Id.* Defendant never provided the children with financial support or gifts, nor did he assume any parental identity. *Id.* at 38. Defendant had no further contact with either plaintiff or the children until May 1999 when plaintiff randomly obtained defendant's phone number and subsequently filed for child support. *Id.*

The court first finds that an oral agreement existed between plaintiff and defendant in that the defendant

volunteered to anonymously donate his sperm for the IVF procedure in exchange for being released of any rights to the children or obligation to pay child support. Oral contracts are normally enforceable. *Egyptian Sands Real Estate Inc. v. Polony,* 222 Pa. Super. 315, 320, 294 A.2d 799, 803 (1972). However, no agreement is enforceable without valid consideration. "Valid 'consideration' confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise." *Cardamone v. University of Pittsburgh,* 253 Pa. Super. 65, 72 n.6, 384 A.2d 1228, 1232 n.6 (1978) (citing *Hillcrest Foundation Inc. v. McFeaters,* 332 Pa. 497, 503, 2 A.2d 775, 778 (1938)). While forbearance from proceeding with a lawsuit may constitute good consideration for an agreement, it must be bargained for and given in exchange for the promise made by the promisor. *Id.* The defendant's anonymous donation of his sperm and plaintiff's promise to forego any action for child support amounted to good consideration. Here we find the oral agreement entered into by the parties expressed their intentions and was supported by valid consideration.

Insofar as the agreement kept defendant's identity secretive, no other persons were privy to the agreement. Thus, the court relied largely on the testimony of the parties. In determining that a valid contract existed, we simply find the defendant's testimony credible, especially by virtue of the other entire attendant testimony and evidence. Defendant's testimony was consistent throughout all the court's proceedings, whereas plaintiff's testimony contained numerous inconsistencies and

contradictions, not to mention intentional falsehoods, fraud, and deceit involving not only the defendant, but the hospital as well.

Plaintiff testified that she and defendant started discussing having children together in February 1994 after defendant's brother discovered his wife was pregnant around the same time. *Id.* at 169. However, plaintiff visited Dr. Dodson about the IVF process that resulted in the birth of her twin boys in September 1993. After defense counsel impeached plaintiff's credibility with this fact, plaintiff insisted that she and defendant initially began the thought of having children in 1994.

Various persons inquired about plaintiff's pregnancy in 1994 at which times she gave conflicting accounts. Plaintiff revealed to the defendant's brother that the defendant was the father but that it happened accidentally. *Id.* at 112. She told her then husband that her tubes became untied and that she did not know who the father was. *Id.* at 121. Plaintiff stated in her deposition that defendant never attended any of her consultations with Dr. Dodson. She later testified that defendant enthusiastically attended those meetings. N.T. 11/9/01 at 63-64. Plaintiff testified that defendant decided he did not wish to be the twins' father during the fourth or fifth month of plaintiff's pregnancy after defendant met his present wife and she protested that the children would "mess up their white picket fence." N.T. 8/20/01 at 153-54. However, even if this statement were true, which defendant later refuted, defendant did not meet his present wife until late July 1996. N.T. 3/7/02 at 28.

Moreover, as further evidence that an agreement existed, the court notes the great lengths plaintiff took in order to protect defendant's anonymity. When plaintiff initially went to see her OB/GYN in 1993 about having her tubal ligation reversed, her OB/GYN recorded that the plaintiff wished to have more children with her husband and that her husband was in good health. N.T. 11/9/00 at 34. However, plaintiff stated at the time of that meeting, she and Paul Ferguson had been separated and had no contact. *Id.* at 35. The court wonders why the OB/GYN would have taken such notes if the plaintiff did not represent to her OB/GYN that she wanted more children with Paul Ferguson. In reality, the plaintiff never revealed to her OB/GYN that she and Paul Ferguson had been separated for years. *Id.* at 37.

During her consultations with Dr. Dodson in September 1993, plaintiff continuously kept defendant's identity a secret. Plaintiff told Dr. Dodson that she was in a stable, 15-year marital relationship with her husband, and that the two of them desired another child. *Id.* at 38. Dr. Dodson described the man who accompanied plaintiff as a 35-year-old male who was the father of her two children. *Id.* At the time of this initial meeting, Paul Ferguson was indeed 35 years old, whereas the defendant was still in his twenties. Dr. Dodson also elicited information from the man who was with plaintiff at the appointment. Dr. Dodson noted that the husband smoked cigarettes. *Id.* at 40. Plaintiff admitted that defendant did not smoke cigarettes. *Id.* (N.T. 8/20/01 at 31.) Dr. Dodson noted that the husband did not drink alcohol. *Id.* However, plaintiff admitted that defendant drank alcohol. *Id.* It is this court's opinion that the defendant was not present during the

interview with Dr. Dodson, and in fact, plaintiff fabricated her testimony that the defendant was there.

The report on the sperm analysis contained Paul Ferguson's name. *Id.* at 43. Defendant concedes that he may have submitted samples prior to the actual donation. N.T. 8/20/01 at 31. However, even if defendant did submit samples for testing, plaintiff still chose to keep defendant's anonymity by not correcting the name on the report. When plaintiff and defendant went to the hospital on February 14, 1994, plaintiff instructed to the defendant that he was to present himself as Paul Ferguson in case anyone asked his identity; the reason being that plaintiff knew Dr. Dodson only performed IVF procedures with married couples and she wished to keep her misrepresentations secretive. N.T. 8/20/01 at 29. Finally, plaintiff made a conscious decision to put Paul Ferguson on the birth certificates as the father.

From these occurrences, it is obvious that the plaintiff went to great lengths to conceal defendant's identity, which was an essential part of her agreement with the defendant. Plaintiff continuously asserted that she merely let her health care providers assume who would be the father of her desired children, and whether or not she was even married. *Id.* at 34, 38, 39, 44, 48. If she and defendant were so happy and excited about having a child together, why did she not simply give the correct information about who the defendant was? Plaintiff is also estopped from arguing that she could not reveal to Dr. Dodson her plans to do the IVF procedure with someone other than her husband, because Dr. Dodson's staff informed her that one of Dr. Dodson's colleagues would

perform the IVF procedure with her and someone other than her husband. Dodson deposition at 36-37. Indeed, if plaintiff and defendant did not have this agreement emphasizing defendant's anonymity, why did they not retain a physician who was willing to perform the IVF procedure despite the fact they were unmarried? The parties wished defendant's identity to be kept secretive, and only in 1999, when the twins were five years old, did the plaintiff wish to rescind that anonymity. The court finds that plaintiff actively sought to conceal defendant's anonymity in furtherance of their agreement.

In finding that a valid contract existed between the parties, the remaining inquiry for the court is whether the contract is enforceable. The court is cognizant of the Superior Court's reinforcing that "a parent cannot bind a child or bargain away that child's right to support." *Kesler v. Weniger,* 744 A.2d 794, 796 (Pa. Super. 2000). The court notes Judge Beck's concurring opinion in which she explained that the growing "legal and ethical complexity" in the realm of reproduction mandates that the courts should not comprehensively preclude all contracts of this nature, but refrain from doing so given the unique circumstances in a particular case. *Id.* at 796.

The court believes that what Judge Beck was referring to is squarely before this court. Obviously, this is not a simple contract case. Rather, it is the far from ordinary facts placed before the court that has led us to hold accordingly. Had the plaintiff's pregnancy begun by way of intercourse, we would have had no difficulty adhering to the ruling in *Kesler* and found the defendant liable.

The use of artificial insemination has become widespread and the essence of a clinical donor is that the donor's identity remains anonymous. In accordance with this concept, the parties chose to keep defendant's identity confidential throughout the IVF procedure and beyond. That anonymity remained intact until defendant's brother noticed plaintiff's obvious condition and plaintiff admitted to him that defendant was the donor. Sperm donors are commonly used in this country. The nature by which donors give their sperm for the use in artificial insemination is contractual, albeit most often the parties retain their anonymity. The fact that defendant was not totally anonymous in the end does not change the contractual nature of his relationship with the plaintiff. We agree with the defendant that if the use of donors in artificial insemination proceedings is permitted in the Commonwealth of Pennsylvania, the donor should be protected from liability to the donee, regardless of whether his identity is actually known to the donee.

Nevertheless, this court cannot ignore and callously disregard the interests of the unheard-from third party; a party who without their privity to this contract renders it void. No other party, albeit a parent, can bargain away a child's support rights. Although we find the plaintiff's actions despicable and give the defendant a sympathetic hue, it is the interest of the children we hold most dear. Accordingly, we hold that the defendant's appeal from the Dauphin County Domestic Relations' determination is denied, the defendant is the legal father of the twins, and he is obligated to pay child support to the plaintiff.