940 A.2d 1236

**Ivonne V. FERGUSON, Appellee**

**v.**

**Joel L. McKIERNAN, Appellant.**

Supreme Court of Pennsylvania.

Argued May 17, 2005.

Decided Dec. 27, 2007.

John W. Purcell, Jr., Harrisburg, for Joel L. McKiernan.

Elizabeth Aycock Hoffman, for Ivonne V. Ferguson.

CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## OPINION

Justice BAER.[1]

We are called upon to determine whether a sperm donor involved in a private sperm donation—*i.e.,* one that occurs outside the context of an institutional sperm bank—effected through clinical rather than sexual means may be held liable for child support, notwithstanding the formation of an agreement between the donor and the donee that she will not hold the donor responsible for supporting the child that results from the arrangement. The lower courts effectively determined that such an agreement, even where bindingly formed, was unenforceable as a matter of law. Faced with this question of first impression in an area of law with profound importance for hundreds, perhaps thousands of Pennsylvania families, we disagree with the lower courts that the agreement in question is unenforceable. Accordingly, we reverse.

Former paramours Joel McKiernan (Sperm Donor) and Ivonne Ferguson (Mother) agreed that Sperm Donor would furnish his sperm in an arrangement that, by design, would feature all the hallmarks of an anonymous sperm donation: it would be carried out in a clinical setting; Sperm Donor's role in the conception would remain confidential; and neither would Sperm Donor seek visitation nor would Mother demand from him any support, financial or otherwise. At no time

1. This case was reassigned to this author.

prior to conception, during Mother's pregnancy, or after the birth of the resultant twins did either party behave inconsistently with this agreement, until approximately five years after the twins' birth, when Mother filed a motion seeking child support from Sperm Donor. The trial court, recognizing the terms of the agreement outlined above and expressing dismay at what it found to be Mother's dishonest behavior, nevertheless found that the best interests of the twins rendered the agreement unenforceable as contrary to public policy. Thus, the court entered a support order against Sperm Donor, which the Superior Court affirmed.

The trial court found, and the record supports,[2] the following account of the events leading up to this litigation. Sperm Donor met Mother in May 1991, when he began his employment with Pennsylvania Blue Shield, where Mother also worked. At that time, Mother was married to and living with Paul Ferguson (Husband), although whether their sexual relations continued at that point is subject to dispute. Mother was raising two children she had conceived with Husband, while he provided little if any emotional or financial support.

Later that year, Sperm Donor's and Mother's friendly relations turned intimate, and in or around November 1991 their relationship took on a sexual aspect. Mother assured Sperm Donor that she was using birth control, and the couple did not use condoms. Although Mother variously indicated to Sperm Donor that she was taking birth control pills or using injectable or implanted birth control, in fact she had undergone tubal ligation surgery in or around 1982, following the birth of her second child by Husband.

The parties continued their intimate relationship until some time in 1993, maintaining separate residences but seeing each other frequently. On more than one occasion during that span, they "broke up," only to reconcile after brief hiatuses. During the summer of 1993, however, their relationship began to flag.

2. This Court is bound to a trial court's findings of fact to the extent that they are supported by competent evidence. *See Triffin v. Dillabough,* 552 Pa. 550, 716 A.2d 605, 607 (1998).

Early that year, Mother had consulted a physician regarding the feasibility of reversing her tubal ligation to enable her to conceive another child. In September 1993, after learning that her tubal ligation was irreversible,[3] Mother approached physician William Dodson at Hershey Medical Center, to discuss alternative methods of conception, specifically *in vitro* fertilization (IVF) using donor sperm followed by implantation of the fertilized eggs. Mother did not inform Sperm Donor of either consultation, and continued to mislead him by referring to one or more alternative methods of contraception she claimed to be using or considering using.

Toward the end of 1993, the parties' relationship had changed in character from an intimate sexual relationship to a friendship without the sexual component. At about that time, late in 1993, Mother broached the topic of bearing Sperm Donor's child. Even though Mother biologically was incapable of conceiving via intercourse due to her irreversible tubal ligation, and notwithstanding that the parties were no longer in a sexual relationship, she inexplicably suggested first that they conceive sexually. Sperm Donor, evidently unaware that the point was moot, refused. He made clear that he did not envision marrying Mother, and thus did not wish to bear a child with her.

Revising her approach, Mother then suggested that Sperm Donor furnish her with his sperm for purposes of IVF. Initially, Sperm Donor expressed his reluctance to do so. He relented, however, once Mother convinced him that she would release him from any of the financial burdens associated with conventional paternity; that she was up to the task of raising an additional child in a single-parent household and had the financial wherewithal to do so; and that, were he not to furnish his own sperm, she would seek the sperm of an anonymous donor instead.[4]

3. The trial court frames it thus, and the record supports that finding. It is less clear, however, whether Mother actually underwent a procedure aimed at reversing the ligation, or simply was advised that reversal was not an option.

4. In testimony uncontradicted by Mother, Sperm Donor stated that Mother preferred him to an anonymous sperm donor because "[s]he

To that end, Mother continued her consultations with Dr. Dobson at Hershey Medical Center, at least once visiting Dr. Dobson with a male companion. Although the evidence is heavily disputed in this regard, the trial court found that representations were made to Dr. Dobson that the man accompanying Mother was Husband.[5] The trial court further found that Sperm Donor was not aware of these preliminary consultations. Moreover, most paperwork pertaining to the procedure was completed without Sperm Donor's knowledge or participation, an aspect of the case the trial court found reflective of Mother's "latent subterfuge."

On February 14, 1994, Sperm Donor traveled to Hershey Medical Center to provide a sperm sample.[6] This sample was used, in turn, to fertilize Mother's eggs, which then were implanted. The procedure succeeded, enabling Mother to become pregnant. Sperm Donor in no way subsidized the IVF procedure.

During Mother's pregnancy, Sperm Donor and Mother remained friends, visited regularly, and spoke frequently on the phone, although as noted their relationship was no longer sexual or romantic in character. The trial court found, however, that Sperm Donor attended none of Mother's prenatal examinations and did not pay any portion of Mother's prenatal expenses. Although both parties made an effort to preserve Sperm Donor's anonymity as the source of the sperm donation during the pregnancy, Mother admitted the truth to Sperm Donor's brother when he asked whether Sperm Donor was the father. Sperm Donor also admitted his own role in Mother's pregnancy to his parents when they confronted him, following their receipt of anonymous phone calls insinuating as much.

knew my background. She just knew my makeup, and just said that she preferred to have that anonymous donor known to her." Notes of Testimony, 8/20/2001, at 22–23.

5. This finding is supported not just by testimony but by inference, insofar as there appears to be no dispute that Dr. Dobson will assist in IVF only for women in stable marriages.

6. Coincidentally, the paperwork for Mother's divorce from Husband was filed the same day.

In August 1994, Mother went into labor prematurely. "In a panic," as the trial court characterized it, Mother contacted Sperm Donor and asked him to attend the birth. Believing that she had no one else to turn to, Sperm Donor joined Mother in the hospital. Even during the birth on August 25, 1994, however, Sperm Donor maintained his anonymity regarding his biological role in the pregnancy, an effort Mother affirmatively supported when she named Husband as the father on the twins' birth certificates, and reinforced by the fact that Sperm Donor neither was asked, nor offered, to contribute to the costs associated with Mother's delivery of the twins.

Regarding Sperm Donor's and Mother's post-partum interactions, the trial court found that,

[a]fter the twins were born, [Sperm Donor] saw [Mother] and the boys on a few occasions in the hospital. Approximately two years after the births, [Sperm Donor] spent an afternoon with [Mother] and the twins while visiting his parents in Harrisburg.[7] [Sperm Donor] never provided the children with financial support or gifts, nor did he assume any parental identity. [Sperm Donor] had no further contact with either [Mother] or the children until May 1999 when [Mother] randomly obtained [Sperm Donor's] phone number [8] and subsequently filed for child support.

*Ferguson v. McKiernan,* 60 Pa. D. & C.4th 353, 358 (Dauphin Cty.2002) (citations omitted).

In the years after Mother gave birth to the twins and before Mother sought child support, Sperm Donor moved to Pittsburgh, met his future wife, married her, and had a child with her. Indeed, Sperm Donor's wife was pregnant with their second child when she testified in the trial court in these proceedings.

**7.** By then, Sperm Donor had moved to the Pittsburgh area.

**8.** Although the court's characterization of the relevant interaction as "random" is not unfair, it risks being misleading. Evidently, Mother had occasion to contact Sperm Donor's office for business purposes. She discovered Sperm Donor's name and number as a consequence of that interaction, and proceeded to call him seeking support, claiming that welfare officials had pressured her to do so.

Based on this recitation of facts, the trial court found that the parties had formed a binding oral agreement prior to the twins' conception pursuant to which Sperm Donor would provide Mother with his sperm and surrender any rights and privileges to the children arising from his biological paternity in return for being released of any attendant support obligation. The parties further agreed to keep secret Sperm Donor's genetic connection to the twins. The trial court found ample evidence of the parties' intention in this regard, and determined that Sperm Donor's provision of sperm and Mother's agreement to forego any right to seek financial support from Sperm Donor constituted valid consideration as a matter of law, rendering the agreement a binding contract specifying the parties' rights and obligations.

The trial court reached this conclusion based on its determination that, "by virtue of the attendant testimony and evidence," Sperm Donor's testimony was more credible than the competing account offered by Mother. *Id.* at 359. "[Sperm Donor's] testimony was consistent throughout the Court's proceedings, whereas [Mother's] testimony contained numerous inconsistencies and contradictions, not to mention intentional falsehoods, fraud, and deceit involving not only [Sperm Donor] but the hospital as well." *Id.* at 359–60. The trial court reinforced its point by highlighting numerous irregularities in Mother's testimony. *Id.* at 360–63.

The court nevertheless found the agreement unenforceable. Citing the Superior Court's holding in *Kesler v. Weniger,* 744 A.2d 794, 796 (Pa.Super.2000), that "a parent cannot bind a child or bargain away that child's right to support," the court found its discretion restrained.

[T]his Court cannot ignore and callously disregard the interests of the unheard-from third party[,] a party who without their privity to this contract renders it void. No other party, albeit a parent, can bargain away a child's support rights. Although we find the Plaintiff's actions despicable and give [*sic*] the Defendant a sympathetic hue, it is the interest of the children we hold most dear. Accordingly, we hold that the Defendant's appeal from the Dau-

phin County Domestic Relations' determinations is denied, the Defendant is the legal father of the twins, and he is obligated to pay child support to the Plaintiff.

*Ferguson*, 60 Pa. D. & C.4th at 364. Relying on the support guidelines, based on Mother's monthly net income of $1947.61 and Sperm Donor's monthly net income of $5262.30, the court imposed on Sperm Donor an ongoing support obligation of $1384 per month effective retroactively to January 1, 2001, with a corresponding arrear of $66,033.66 due immediately upon issuance of the order.

█ A panel of the Superior Court affirmed the trial court's ruling in a unanimous opinion that echoed the trial court's ruling. *See Ferguson v. McKiernan*, 855 A.2d 121 (Pa.Super.2004). The Superior Court began with the premise that "[t]he oral agreement between the parties that appellant would donate his sperm in exchange for being released from any obligation for any child conceived, on its face, constitutes a valid contract." *Id.* at 123.[9] Like the trial court, however, the

9. The Superior Court's phrasing here is unfortunate because it is less than clear that a release from putative support obligation constitutes a benefit or forbearance sufficient to comprise legally enforceable consideration. The trial court, however, found that the parties' bargain in fact entailed Sperm Donor's commitment not to seek paternal privileges in exchange for Mother's agreement not to seek support. *Ferguson*, 60 Pa. D. & C.4th at 356. This finding of fact, which is disregarded by Mother in her effort to argue that consideration for the original agreement was lacking, Brief for Appellee at 11 ("[T]he only possible exchange of promises [prior to conception] would be the consent to donate the sperm and the donee's agreement to use it for the IVF procedure."), describes consideration sufficient to sustain an otherwise enforceable contract. *See York Metal & Alloys Co. v. Cyclops Steel Co.*, 280 Pa. 585, 124 A. 752, 754 (1924)("There is a consideration if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not." (internal quotation marks omitted)); *cf. Stern v. Stern*, 430 Pa. 605, 243 A.2d 319, 321–22 (1968)(holding, in the context of a property settlement in a divorce, that "the family settlement was, itself, ample consideration"). That the mutual forbearance in question depends on the occurrence of a contingent event, *i.e.*, the birth of a child or children, does not change this analysis, as contracts often are designed to take effect only upon the occurrence of some future contingency. *See, e.g., Dora v. Dora*, 392 Pa. 433, 141 A.2d 587, 591 (1958)(finding enforceable a contract specifying the obligations of

Superior Court found the agreement so formed to be unenforceable as against public policy, and rejected Sperm Donor's contract- and estoppel-based arguments. "Due to the fact the contract between appellee and appellant bargained away a legal right not held by either of them, . . . but belonging to the subject children, the contract was not enforceable." *Id.* at 124 (citing *Kesler*, 744 A.2d 794).

■■■■ Against this background, in which both of the lower courts found an agreement sufficiently mutual and clear to be binding, the lone question we face is as simple to state as it is vexing to answer. We must determine whether a would-be mother and a willing sperm donor can enter into an enforceable agreement under which the donor provides sperm in a clinical setting for IVF and relinquishes his right to visitation with the resultant child(ren) in return for the mother's agreement not to seek child support from the donor. In considering this pure question of law, our standard of review is *de novo* and the scope of our review is plenary. *See Pennsylvania Nat. Mut. Cas. Co. v. Black*, 591 Pa. 221, 916 A.2d 569, 578 (2007). We begin by reviewing the thorough arguments presented by the parties.

Sperm Donor argues first that Pennsylvania law and public policy precluding parents from bargaining away a child's entitlement to child support should not preclude enforcement of an otherwise binding contract where the bargain in question occurs prior to, and indeed induces, the donation of sperm for IVF and implantation in a clinical setting. Sperm Donor urges this Court to hold that the fact that the agreement was formed months prior to conception distinguishes this case from precedent preventing parents from bargaining away a child in being's right to seek child support. *See, e.g., Knorr v. Knorr*, 527 Pa. 83, 588 A.2d 503, 505 (1991)(holding that, while "Parties to a divorce action may bargain between themselves and structure their agreement as best serves their interests," they may not bargain away the rights of their children to support). Sperm Donor emphasizes that he provided his

parties to a divorce even where that contract was to be performed only in the event of the later entry of a final divorce decree).

sperm to Mother contingent on her promise not to seek child support in the future—that the promise was, in effect, a "but for" cause of the twins' conception and birth. Sperm Donor maintains that his and Mother's shared intention "was to cloak [their] agreement in the same legal protections that an anonymous sperm donor enjoys," and that "people should be free to enter into these agreements, in the interest of allowing people access to greater ... options concerning the areas of reproduction." Brief for Appellant at 16.

Sperm Donor contends that to uphold the Superior Court's ruling will call into question the legal status of all sperm donors, including those who donate anonymously through sperm banks. Sperm Donor buttresses his argument by reference to the Uniform Parentage Act (UPA), a proposed uniform law originally promulgated in 1973 by the American Bar Association and adopted, in some form, by at least nineteen states.[10] Sperm Donor observes that the UPA, which he acknowledges has not been adopted by this Commonwealth, does not require anonymity in the sperm donor context to protect the donor from subsequent parental responsibility and the child and parent from a donor's subsequent claim of parental privileges. Rather, the UPA provides unequivocally that "A donor is not a parent of a child conceived by means of assisted reproduction." UPA § 702. The Comment to § 702 elaborates: "The donor can neither sue to establish parental rights, nor be sued and required to support the resulting child. *In sum, donors are eliminated from the parental equation.*"

10. Subsequent citations to the UPA will refer to it by "UPA" followed by a section number. The UPA, as amended through 2002, is available, in electronic form, at http://www.law.upenn.edu/bll/ulc/upa/final2002. htm (last reviewed, June 11, 2007). States adopting the UPA in some form include Alabama, California, Colorado, Delaware, Hawaii, Illinois, Kansas, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Rhode Island, Washington, and Wyoming. *See* Ralph C. Brashier, *Children and Inheritance in the Nontraditional Family,* 1996 UTAH L.REV 93, 119 & nn. 94–95 (discussing artificial insemination and surveying states' laws regarding the legal status of a sperm donor). Although states adopting the UPA principally rely on the 1973 text, the 2002 revision does not differ materially with respect to the legal status of sperm donors, hence all references to the UPA refer to the 2002 text.

UPA § 702 Cmt. (emphasis added).[11] Sperm Donor argues that the Commonwealth should not concern itself with the question of anonymity if the parties to the agreement themselves are not concerned. Sperm Donor also argues that an absolute holding of parental responsibility in this case threatens other contract-based alternative reproductive arrangements, such as adoption and institutional sperm donation, since the lower court rulings both plausibly may be read to hold that any contract denying a child the support of any biological parent necessarily violates public policy.

Mother, conversely, argues that this Court should uphold the lower courts' rulings that the best interests of the child preclude enforcement of the parties' contract, contending that "there is no basis for making an exception [to the best interests approach] merely because the children at issue were conceived in a clinical setting and the agreement was made prior to their conception." Brief for Appellee at 8. She argues that if this Court rules otherwise, it will act impermissibly in place of the General Assembly and contrarily to 23 Pa.C.S. § 5102,[12] which "mandates that without exception" all children shall be "legitimate" without regard to the marital status of their parents, and that children born out of wedlock shall enjoy all rights and privileges of children born to married parents. Brief for Appellee at 8.

11. Notably, the UPA as drafted urges any sperm donor seeking to assert paternity over the offspring resulting from his donation to execute a writing manifesting that intent. UPA § 704(a); *cf. id.* § 704(b)(providing that a donor may be found to be father to the child if he and the mother cohabitate for two years and hold the child out as their own).

12. Section 5102 ("Children declared to be legitimate") provides, in part:

(a) **General rule.**—All children shall be legitimate irrespective of the marital status of their parents, and, in every case where children are born out of wedlock, they shall enjoy all the rights and privileges as if they had been born during the wedlock of their parents except as otherwise provided in Title 20 (relating to decedents, estates and fiduciaries).

23 Pa.C.S. § 5102. We reject Mother's invocation of this section, as the matter before us is not the twins' "legitimacy" but their entitlement to Sperm Donor's support notwithstanding the contrary agreement entered into by Mother and Sperm Donor.

Mother rejects Sperm Donor's reliance on UPA § 702, emphasizing that for over thirty years the General Assembly has failed to adopt the model act. The twins, Mother argues, are Sperm Donor's offspring pursuant to § 5102, and have the same right to his support they would have if Sperm Donor and Mother had conceived by sexual intercourse. Mother observes that the General Assembly, beginning in 1975, repeatedly has considered bills purporting to elaborate on the legal relationships spawned by reproductive alternatives, but none has made it out of committee.[13] Mother argues that the General Assembly's failure to enact these bills signals its "unwillingness ... to adopt the UPA provision which ... eliminates all sperm donors (except the spouse of the donee) from the 'parental equation.'" Brief for Appellee at 10.

To reinforce her argument that this Court should decline to act in the absence of legislative guidance, Mother cites *Benson ex rel. Patterson v. Patterson*, 574 Pa. 346, 830 A.2d 966 (2003), in which this Court declined to impose a continuing support obligation against a deceased parent's estate. There, this Court observed that "it is not the role of the judiciary to legislate changes in the law which our legislature has declined to adopt." *Id.* at 967 (internal quotation marks omitted). In declining to impose a continuing support obligation on decedent's estate, we noted the then recent expansion of the duty of parents to support their minor children, *see generally* 23 Pa.C.S. § 4321 ("Liability for support"), coupled to the legislature's omission "to extend the duty of support to the estates of deceased parents," either "directly or inferentially," and concluded that we would exceed our authority to do so in lieu of the legislature. *Patterson*, 830 A.2d at 967–68. Mother maintains that to rule in favor of Sperm Donor would amount to judicial legislation of "that which the General Assembly has declined to enact," in violation of the institutional restraint

13. *See* House Bill 2520 (1975) ("Legitimation of Children Born by Artificial Insemination"); Senate Bill 408 (2005) ("Surrogate Parenting Agreements") (referred to Senate Judiciary Committee, March 14, 2005).

· 

animating our decision in *Patterson.* Brief for Appellee at 10–11.[14]

 Mother's argument, for all its nuance, effectively relies on the same background principle that the lower courts found dispositive: that even mutually entered and otherwise valid contracts are unenforceable when the contracts violate clear public policy[15]—in this case, the Commonwealth's oft-stated 'policy not to permit parents to bargain away their child's right to support. Notably, neither the courts below nor Mother undertake the rigorous analysis called for by our caselaw governing the enforceability of contracts supposed to violate public policy,[16] relying instead on a tenuous analogy between the instant circumstances and those of divorce or

14. Notably, neither Mother nor either Dissenting Opinion offers any counterargument to Sperm Donor's suggestion that a ruling in Mother's favor will call into question the legal relationships created in the context of commercial sperm donation. *See infra* n. 21.

15. *See Mamlin v. Genoe,* 340 Pa. 320, 17 A.2d 407, 409 (1941).

16. In assessing whether a contractual agreement violates public policy this Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract. *Hall v. Amica Mut. Ins. Co.,* 538 Pa. 337, 347, 648 A.2d 755, 760 (1994) [ . . . . ]
> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action.

*Id.* at 347–48, 648 A.2d at 760. (citations omitted). This Court has further elaborated that:
> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].

*Mamlin v. Genoe,* 340 Pa. 320, 325, 17 A.2d 407, 409 (1941).
*Eichelman v. N'wide Ins. Co.,* 551 Pa. 558, 711 A.2d 1006, 1008 (1998)(unbracketed modifications in original; bracketed ellipsis added).

other parenting arrangements arising in the context of sexual relationships.

This analogy, however, is unsustainable in the face of the evolving role played by alternative reproductive technologies in contemporary American society. It derives no authority from apposite Pennsylvania law, and it violates the common-sense distinction between reproduction via sexual intercourse and the non-sexual clinical options for conception that are increasingly common in the modern reproductive environment. The inescapable reality is that all manner of arrangements involving the donation of sperm or eggs abound in contemporary society, many of them couched in contracts or agreements of varying degrees of formality. *See* UPA Art. 7. Prefatory Cmt. (outlining the various reproductive alternatives available to parties seeking to raise children). An increasing number of would-be mothers who find themselves either unable or unwilling to conceive and raise children in the context of marriage are turning to donor arrangements to enable them to enjoy the privilege of raising a child or children, a development neither our citizens nor their General Assembly have chosen to proscribe despite its growing pervasiveness.[17]

Of direct relevance to the instant case, women, single and otherwise, increasingly turn to anonymous sperm donors to enable them to conceive either *in vitro* or through artificial insemination. In these arrangements, the anonymous donor and the donee respectively enter into separate contracts with a sperm bank prior to conception and implantation of an embryo or embryos. The contract releases the mother from any obligation to afford the sperm donor a father's access to

17. *See* Brashier, *supra* n. 10, at 183 n. 299 (citing a 1987 study that estimated 65,000 annual births via artificial insemination, approximately half of which occurred using donated sperm); *cf.* Centers for Disease Control and Prevention, Assisted Reproductive Technology Surveillance—United States, 2003 (May 26, 2006), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/ss5504a1.htm (last reviewed June 11, 2007) (noting that a total of 122,872 alternative reproductive procedures resulting in the creation of embryos were reported to CDC in 2003, including 1413 pregnancies in Pennsylvania).

the child for visitation or custody while releasing the donor from any obligation to support the child.[18]

Thus, two potential cases at the extremes of an increasingly complicated continuum present themselves: dissolution of a relationship (or a mere sexual encounter) that produces a child via intercourse, which requires both parents to provide support; and an anonymous sperm donation, absent sex, resulting in the birth of a child. These opposed extremes produce two distinct views that we believe to be self-evident. In the case of traditional sexual reproduction, there simply is no question that the parties to any resultant conception and birth may not contract between themselves to deny the child the support he or she requires. *See, e.g., Knorr,* 588 A.2d at 505 ("[Parent's] right to bargain for themselves is their own business. They cannot in that process set a standard that will leave their children short."); *Kesler,* 744 A.2d at 796 (same). In the institutional sperm donation case, however, there appears to be a growing consensus that clinical, institutional sperm donation neither imposes obligations nor confers privileges upon the sperm donor.[19] Between these poles lies a spectrum of arrangements that exhibit characteristics of each extreme to varying degrees—informal agreements between friends to conceive a child via sexual intercourse; non-clinical non-sexual insemination; and so on.

Although locating future cases on this spectrum may call upon courts to draw very fine lines, courts are no strangers to such tasks, and the instant case, which we must resolve, is not nearly so difficult. The facts of this case, as found by the trial

18. At least one such contract goes even further, ensuring these protections by providing for the physical destruction of all records pertaining to a sperm donor's identity. *See Johnson v. Superior Court,* 80 Cal. App.4th 1050, 95 Cal.Rptr.2d 864, 867 (2000).

19. As noted, *see supra* n. 13 and accompanying text, in the decades that such reproductive alternatives have been available, the absence of a strong public will of any sort has resulted in the failure of the General Assembly to enact any directly applicable legislation. Of course, this observation and others like it stop well short of suggesting there is no opposition to the practice. That a group of citizens disapproves of a practice, in any event, does not amount to a "virtually unanimous" public policy against it.

court and supported by the record, reveal the parties' mutual intention to preserve all of the trappings of a conventional sperm donation, including formation of a binding agreement. Indeed, the parties could have done little more than they did to imbue the transaction with the hallmarks of institutional, non-sexual conception by sperm donation and IVF. They negotiated an agreement outside the context of a romantic relationship; they agreed to terms; they sought clinical assistance to effectuate IVF and implantation of the consequent embryos, taking sexual intercourse out of the equation;[20] they attempted to hide Sperm Donor's paternity from medical personnel, friends, and family; and for approximately five years following the birth of the twins both parties behaved in every regard consistently with the intentions they expressed at the outset of their arrangement, Sperm Donor not seeking to serve as a father to the twins, and Mother not demanding his support, financial or otherwise. That Mother knew Sperm Donor's identity, the parties failed to preserve Sperm Donor's anonymity from a handful of family members who were well acquainted with Sperm Donor and Mother alike, and Mother acted on her preference to know the identity of her sperm donor by voluntarily declining to avail herself of the services of a company that matches anonymous donors with willing mothers, reveal no obvious basis for analyzing this case any differently than we would a case involving an institutionally arranged sperm donation.

Assuming that we do not wish to disturb the lives of the many extant parties to anonymous, institutional sperm donation, we can only rule in Mother's favor if we are able to draw a legally sustainable distinction between the negotiated, clinical arrangement that closely mimics the trappings of anonymous sperm donation that the trial court found to have existed in this case and institutional sperm donation, itself. Where such a distinction hinges on something as trivial as the parties' success in preserving the anonymity they took substantial

---

**20.** *Cf. Kesler,* 744 A.2d 794 (declining to reverse a support award based upon a biological father's sperm donor theory, when the "sperm donation" in question was the product of sexual intercourse in the context of a long-term relationship).

steps to ensure, however, we can discern no principled basis for such a distinction.[21]

Moreover, even if, *arguendo*, such a distinction were tenable, it would mean that a woman who wishes to have a baby but is unable to conceive through intercourse could not seek sperm from a man she knows and admires, while assuring him that he will never be subject to a support order and being herself assured that he will never be able to seek custody of the child. Accordingly, to protect herself and the sperm donor, that would-be mother would have no choice but to resort to anonymous donation or abandon her desire to be a biological mother, notwithstanding her considered personal preference to conceive using the sperm of someone familiar, whose background, traits, and medical history are not shrouded in mystery. To much the same end, where a would-be donor cannot trust that he is safe from a future support action, he will be considerably less likely to provide his sperm to a

---

**21.** In this regard, Mr. Justice Eakin's Dissenting Opinion's vague, inconsistent effort to imply that a legally material distinction exists between the instant circumstance and institutional sperm donation is contradicted by the same Opinion's persistent indifference to the means by which a child is conceived. *Compare* Diss. Op. at 101, 940 A.2d at 1250 (Eakin, J.)("This case has little or nothing to do with anonymous sperm clinics and reproductive technology.") *with id.* at 100, 940 A.2d at 1249 ("Is the means by which these parents contracted to accomplish conception enough to overcome [a biological child's] right [to support]? I think not."), *id.* at. 100, 940 A.2d at 1250 ("The only difference between this case and any other conception is the intervention of hardware between one identifiable would-be parent and the other."), *id.* at 102, 940 A.2d at 1251 ("This private contract involves traditional support principles not abrogated by the means chosen by the parents to inseminate the mother....").

Nor can it be said that Mr. Justice Eakin's Dissenting Opinion would protect children of institutional sperm donation based upon its sporadic references to anonymity. In stark refutation of that claim, the Dissent observes that, "While conception is accomplished in ways our forbearers could never [have] imagined, and will in the future be accomplished in ways we cannot now imagine, *that simply is not the issue with a private contract between these identifiable parents.*" *Id.* at 102, 940 A.2d at 1251 (emphasis added). Nowhere does the Dissent qualify its reliance on identifiable parents. Thus, it would appear to follow, under the Dissent's reasoning, that, where a sperm donor's identity has been maintained by a sperm bank, that donor would be legally responsible in Pennsylvania to support every child that shares his DNA as a consequence of his donation, because surely a sperm bank's records, if subject to compulsory process, would render all donors identifiable.

friend or acquaintance who asks, significantly limiting a would-be mother's reproductive prerogatives.[22] There is simply no basis in law or policy to impose such an unpleasant choice, and to do so would be to legislate in precisely the way Mother notes this Court has no business doing.

Moreover, we cannot agree with the lower courts that the agreement here at issue is contrary to the sort of manifest, widespread public policy that generally animates the courts' determination that a contract is unenforceable. The absence of a legislative mandate coupled to the constantly evolving science of reproductive technology and the other considerations highlighted above illustrate the very opposite of unanimity with regard to the legal relationships arising from sperm donation, whether anonymous or otherwise. This undermines any suggestion that the agreement at issue violates a "dominant public policy" or "obvious ethical or moral standards," *Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 648 A.2d 755, 760 (1994), demonstrating a "virtual unanimity of opinion," *Mamlin v. Genoe*, 340 Pa. 320, 17 A.2d 407, 409 (1941), *see generally supra* n. 16, sufficient to warrant the invalidation of an otherwise binding agreement.

 This Court takes very seriously the best interests of the children of this Commonwealth, and we recognize that to rule in favor of Sperm Donor in this case denies a source of support to two children who did not ask to be born into this situation. Absent the parties' agreement, however, the twins would not have been born at all, or would have been born to a different and anonymous sperm donor, who neither party disputes would be safe from a support order. Further, we cannot simply disregard the plight of Sperm Donor's marital child, who also did not ask to be born into this situation, but whose interests would suffer under the trial court's order.[23]

22. *See In re Interest of R.C.*, 775 P.2d 27, 33 (Colo.1989) ("[A]nonymous donors are not likely to donate semen if they can later be found liable for support obligations, and women are not likely to use donated semen from an anonymous source if they can later be forced to defend a custody suit and possibly share parental rights and duties with a stranger.").

23. Notably, as narrowly as our courts focus upon the best interests of children who appear before them, that focus does not operate to the

The parties in this case agreed to an arrangement that to all appearances was to resemble—and in large part did resemble for approximately five years—a single-parent arrangement effectuated through the use of donor sperm secured from a sperm bank. Under these peculiar circumstances, and in considering as we must the broader implications of issuing a precedent of tremendous consequence to untold numbers of Pennsylvanians, we can discern no tenable basis to uphold the trial court's support order. Rather, we hold that the agreement found by the trial court to have been bindingly formed, which the trial court deemed nevertheless unenforceable is, in fact, enforceable.

Because we hold that the parties' agreement not to seek visitation or support is enforceable in this case, we reverse the Superior Court's order affirming the trial court's support order, and remand for further action consistent with this Opinion.

Former Justices NIGRO and NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY and Justice CASTILLE join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice EAKIN files a dissenting opinion.

## DISSENTING OPINION

Justice SAYLOR.

Section 5102 of the Domestic Relations Code prescribes that "[a]ll children shall be legitimate irrespective of the

absolute exclusion of all competing policies. The contractual release of biological parents' parental rights in the context of adoption, for example, may given certain contingencies disserve the adopted child's interest later in life in a particular case. Nevertheless, such releases are unequivocally binding. *See generally In re M.L.O.*, 490 Pa. 237, 416 A.2d 88, 89 (1980)(emphasizing the finality, under the Adoption Act, of a parent's voluntary relinquishment of parental rights). Furthermore, we have held that a child is precluded from continuing to enjoy the support of a deceased parent even where decedent's estate is entirely adequate to the task. *See Benson*, 574 Pa. 346, 830 A.2d 966.

marital status of their parents," and, subject to limited exceptions not applicable here, "in every case where children are born out of wedlock, they shall enjoy all the rights and privileges as if they had been born during the wedlock of their parents[.]" 23 Pa.C.S. § 5102(a).

At the core of Appellee's arguments is the contention that the public policy controlling the outcome of this case is embodied in Section 5102's conferral of full rights and privileges upon all children born out of wedlock. The majority, however, dismisses such argument with the comment that this statute relates to a child's legitimacy but not his or her entitlement to support notwithstanding a contrary agreement between a mother and a sperm donor. *See* Majority Opinion, at 72–73 n. 12, 940 A.2d at 1243–1244 n. 12. Section 5102(b), however, makes it clear that the relevant "rights and privileges" referenced in Section 5102(a) include benefits from the father. *See* 23 Pa.C.S. § 5102(b). Moreover, under the statute, the status as father may be determined by a court determination of paternity, *see id.,* which may be established by blood relation. *See* 23 Pa.C.S. § 5104.

I cannot join the majority opinion, as I believe that the Legislature has established the relevant public policy through the provisions quoted above "in every case" involving children born out of wedlock. 23 Pa.C.S. § 5102(a). I realize that a straightforward reading of the statute has potential ramifications for sperm donors in Pennsylvania beyond the unique circumstances presented here, as I believe the Legislature does as well, since it has previously considered various measures to mitigate the impact but has not yet acted to adopt any of these. I also recognize that, as between the mother and father in the present case, the equities do not favor the mother. My position is based on the respective roles of the representative and judicial branches.

## DISSENTING OPINION

Justice EAKIN.

I respectfully dissent from the majority's conclusion appellee can bargain away her children's right to support from their

father merely because he fathered the children through a clinical sperm donation. The majority concludes this is possible because the parties intended "to preserve all of the trappings of a conventional sperm donation ... [and] negotiated an agreement outside the context of a romantic relationship...." Majority Op., at 95, 940 A.2d at 1246. To this, I say, "So what?" The only difference between this case and any other is the means by which these two parents conceived the twin boys who now look for support. Referring to Joel McKiernan as "Sperm Donor" does not change his status—he is their father.

It is those children whose rights we address, not the rights of the parents. Do these children, unlike any other, lack the fundamental ability to look to both parents for support? If the answer is no, and the law changes as my colleagues hold, it must be for a reason of monumental significance. Is the means by which these parents contracted to accomplish conception enough to overcome that right? I think not.

The paramount concern in child support proceedings is the best interest of the child. *Sutliff v. Sutliff*, 515 Pa. 393, 528 A.2d 1318, 1322 (1987). Parents are permitted to enter child support agreements where they negotiate, bargain, and ultimately establish valid child support payments. *See generally Knorr v. Knorr*, 527 Pa. 83, 588 A.2d 503, 504–05 (1991). While "[p]arties to a divorce action may bargain between themselves and structure their agreement as best serves their interests," *id.*, at 505 (citing *Brown v. Hall*, 495 Pa. 635, 435 A.2d 859 (1981)), the ability of parents to bargain child support is restricted:

> [Parents] have no power ... to bargain away the rights of their children.... They cannot in that process set a standard that will leave their children short. Their bargain may be eminently fair, give all that the children might require and be enforceable because it is fair. When it gives less than required or less than can be given to provide for the best interest of the children, it falls under the jurisdiction of

the court's wide and necessary powers to provide for that best interest.

*Id.* (internal citations omitted).

I agree, as did the Superior Court, with the trial court's fundamental recognition that "it is the interest of the children we hold most dear." *Ferguson v. McKiernan,* 855 A.2d 121, 124 (Pa.Super.2004) (quoting Trial Court Opinion, 12/31/02, at 9). This Court possesses "wide and necessary powers to provide for [a child's] best interest." *Knorr,* at 505. "[P]arents have a duty to support their minor children even if it causes them some hardship." *Sutliff,* at 1322 (citation omitted).

The majority, with little citation to authority, relies on policy notions outside the record, such as "the evolving role played by alternative reproductive technologies in contemporary American society," Majority Op., at 1245, and hypothetical scenarios concerning reproductive choices of individuals. *Id.,* at 1245. These musings are thought-provoking, but are ultimately inapplicable to this case of enforceability of a private contract ostensibly negating a child's right to support—a contract our jurisprudence has long ago held to be unenforceable. This case has little or nothing to do with anonymous sperm clinics and reproductive technology.

Speculating about an anonymous donor's reluctance is irrelevant—there is no anonymity here and never has been. There was no effort at all to insulate the identity of the father—he was a named party to the contract! This is not a case of a sperm clinic where donors have their identity concealed. The only difference between this case and any other conception is the intervention of hardware between one identifiable would-be parent and the other.

The majority also references the Uniform Parentage Act (UPA). Our legislature has not adopted the UPA. This Court has held, "it is not the role of the judiciary to legislate changes in the law which our legislature has declined to adopt." *Benson ex rel. Patterson v. Patterson,* 574 Pa. 346, 830 A.2d 966, 967 (2003) (quoting *Garney v. Estate of Hain,* 439 Pa.Su-

per. 42, 653 A.2d 21 (1995)). The "legislature ... has taken an active role in developing the domestic relations law of Pennsylvania," *id.*, at 968, and because it has not adopted the UPA, this Court should not consider it; the subject matter is within that body's purview. If anything, the failure to enact it speaks of rejection of its principles, not acceptance of them.

Indeed, it is not our place to legislate, yet the refusal to recognize a traditional and just right to support because of "evolving" notions (which are not directly applicable to the facts) is surely legislation from the Court. To deny these children their right to support from their father changes long-standing law—if the legislature wishes to disenfranchise children whose conception utilizes clinical procedures, it may pass such a law, but we should not. The legislature can best undertake consideration of all the policy and personal ramifications of "evolving" notions and "alternative reproductive technologies in contemporary American society." Majority Op., at 93, 940 A.2d at 1245.

While conception is accomplished in ways our forbearers could never have imagined, and will in the future be accomplished in ways we cannot now imagine, that simply is not the issue with a private contract between these identifiable parents. We do not have anonymity—we have a private contract between parents who utilized a clinical setting to accomplish those private aims, the creation of a child. The issue is not anyone's ability or future reluctance to utilize anonymous sperm banks—the issue is the right of these two boys to support, and whether there are compelling reasons to remove that right from them. The children point and say, "That is our father. He should support us." What are we to reply? "No! He made a contract to conceive you through a clinic, so your father need not support you." I find this unreasonable at best.

This private contract involves traditional support principles not abrogated by the means chosen by the parents to inseminate the mother, and I would apply the well-settled precedent that the best interest of the children controls. A parent cannot bargain away the children's right to support. These

children have a right to support from both parents, including the man who is *not* an anonymous sperm donor, but their father.

I would affirm the Superior Court, as the agreement here is against the public policy and thus unenforceable.