J-E02004-23

2023 PA Super 261

| | | |
|---|---|---|
| CHANEL GLOVER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICOLE JUNIOR | : | No. 1369 EDA 2022 |

Appeal from the Order Entered May 4, 2022
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): D22048480

BEFORE: PANELLA, P.J., BOWES, J., OLSON, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., McLAUGHLIN, J., KING, J., and McCAFFERY, J.

OPINION BY BOWES, J.:                                    **FILED DECEMBER 11, 2023**

Chanel Glover appeals from the domestic relations court order granting Nicole Junior's petition for pre-birth establishment of parentage of the child that the married couple conceived through *in vitro* fertilization ("IVF") treatment during their marriage.[1]  Glover challenges the trial court's finding that her spouse had a contract-based right to parentage.  For the following reasons, we affirm.

Junior and Glover met during 2019 and married in January 2021 while living in California.  Even prior to the marriage, the couple discussed starting a family through IVF.  In February 2021, the couple entered into an agreement

---

[1] Considering the reality that the non-delivering parent is not always male, as evidenced by this appeal, we refer to the determination of parentage, as opposed to paternity, throughout this opinion.

with Fairfax Cryobank for donated sperm. Glover is listed as the "Intended Parent" and Junior the "co-intended Parent." **See** Fairfax Cryobank Contract, 2/3/21, at 1, 5. In accordance with the Fairfax Cryobank contract, the couple collectively selected a sperm donor from Fairfax Cryobank based specifically on the donor's physical appearance, interests, and area of origin.

The couple moved to Pennsylvania in April of 2021, and in July 2021, Junior and Glover signed an IVF agreement with Reproductive Medicine Associates ("RMA"). Glover signed the agreement as the "Patient" and Junior executed it as the "Partner." **See** RMA Agreement, 7/11/21, at 9. Using Glover's eggs and the sperm from Fairfax Cryobank, the couple conceived a son in August 2021, with a due date of May 18, 2022. The couple mutually decided on a name for the child, hired a doula, and retained the Jerner Law Group, P.C., in anticipation of Junior's "Confirmatory Step-Parent Adoption" of their son. **See** Engagement Letter, 10/13/21 at 1; N.T., 5/3/22, at Exhibits J, M, and V. The doula contract identified both parties as "Client." N.T., 5/3/22, Exhibit M at unnumbered 6. Likewise, both women signed the attorney's engagement letter agreeing to the joint representation and the terms of payment. **See** Engagement Letter, 10/13/21; N.T., 5/3/22, Exhibit J at unnumbered 7-9. Thereafter, on December 5, 2021, the parties each signed affidavits memorializing their intent to have Junior adopt their son, co-parent with equal rights to Glover, and assume financial obligations if the couple should separate. **See** N.T., 5/3/22, at Exhibit K.

Over the ensuing four months, the couple's relationship deteriorated. Junior announced an intent to move from the marital residence when the lease expired. Glover stopped communicating with Junior about the obstetrics appointments and canceled mutually-scheduled events such as the baby shower. In March 2022, Glover informed her spouse that she no longer intended to proceed with the adoption, and on April 18, 2022, Glover filed a divorce complaint.

Two weeks later, Junior filed at the domestic relations docket assigned to the divorce proceedings the petitions for pre-birth establishment of parentage that are the genesis of the matter at issue in this appeal.[2] Following Glover's responses and an evidentiary hearing, the trial court found that Junior had a contractual right to parentage and granted the petitions as follows:

> It is hereby ordered and decreed that: (1) Nicole S. Junior is confirmed as the legal parent of the child conceived during her marriage to Chanel E. Glover via [IVF] and due to be born in May of 2022; (2) Glover shall advise Junior when she goes into labor; (3) Both Glover and Junior shall have access to the child after birth consistent with Glover's medical privacy rights and the hospital's policies regarding newborn children. However, this paragraph shall not in any way be construed as a custody order; ([4]) Glover shall execute the Commonwealth of Pennsylvania's Birthing Parent's worksheet indicating that Nicole S. Junior is the child's

---

[2] Specifically, Junior simultaneously filed a petition for pre-birth establishment of parentage and an emergency petition for pre-birth establishment of parentage. The petitions are nearly identical, and as noted on the face of the May 4, 2022 order, the trial court disposed of both petitions therein. **See** Trial Court Order, 5/4/22, at 2 ("[T]he petition for special relief, each filed on April 27, 2022 seek the same relief. This order resolves both petitions and no further hearing on either petition is necessary.").

other parent; and ([5]) the name of Nicole S. Junior shall appear on the child's birth certificate as a second parent.

When appropriate, a custody complaint may be filed under a custody case number.

Order, 5/4/22, at 1 (cleaned up).

Glover filed a timely appeal and both she and the trial court complied with Pa.R.A.P. 1925.[3] She presents three questions, which we re-order for ease of review:

1. Did the trial court err as a matter of law when it found that [Glover] waived any challenges to the [c]ourt's exercise of its jurisdiction and to its being a proper forum for a decision regarding [Junior's] rights as a legal parent[?]

2. Did the trial court err when it found that the issue of parentage was ripe for determination[?]

3. Did the trial court act within its discretion and err as a matter of law when it confirmed pre-birth legal parentage of [Junior?]

Glover's brief at 5.

Glover first challenges the trial court's jurisdiction to address the petition for pre-birth establishment of parentage. The crux of this contention is that, while the trial court had original jurisdiction over the divorce proceedings and

_____

[3] Glover filed an emergency application for a stay and attached documentation demonstrating that following the May 25, 2022 birth of the child, Junior initiated custody proceedings. On June 14, 2022, this Court temporarily stayed all aspects of the May 4, 2022 order until July 18, 2022, when it entered a subsequent order staying only the portion of the May 4, 2022 order that directed, "the name of Nichole S. Junior shall appear on the child's birth certificate as a second parent." Superior Court Order, 7/18/22. The status of the custody litigation is unknown, but during the oral argument before this Court *en banc*, counsel represented that Junior has not had any contact with the child.

- 4 -

any ancillary claims for relief, the court lacked subject matter jurisdiction over Junior's petition because Glover did not plead custody or parentage in the divorce complaint. **See** Glover's brief at 43 ("[The] trial court did not have the authority, in the divorce forum, or any forum, to entertain an action for pre-birth establishment of parentage, especially as an emergency matter.").

Junior counters that the trial court had the authority to consider Junior's petition pursuant to the Pennsylvania Divorce Code ("the Code"), which Junior contends "confers full equity powers to the family court[.]" Junior's brief at 46. Relying on the Code's preliminary provisions in §§ 3102, 3104, and 3105, concerning the legislative findings and intent, bases of jurisdiction, and effect of agreements between parties, respectively, Junior maintains that the trial court acted within its statutory authority over matters ancillary to the divorce in exercising jurisdiction over the petition to determine parentage. Junior continues that § 3323(f), governing "[e]quity powers and jurisdiction of the court," is effectively a catch-all provision that provides the court authority to grant equitable relief over matters that arise under the Code. Junior's brief at 46.

In rejecting Glover's challenge to its exercise of authority over the petition to determine parentage, the trial court first concluded that the jurisdictional issue was waived pursuant to P.A.R.A.P. 302(a) because Glover neglected to challenge it during the hearing. However, potentially recognizing that challenges to subject matter jurisdiction are non-waivable, the court

provided an alternative statutory basis for its authority under § 3323(f) of the Code. For the reasons that follow, we find that the trial court acted within its broad authority imbued under §§ 3104 and 3323(f) of the Code.

At the outset, we observe that Glover's arguments conflate the principles of jurisdiction and authority. Quoting **Riedel v. Human Relations Comm'n**, 739 A.2d 121, 124 (Pa. 1999), our Supreme Court has reiterated the relevant distinction as follows:

> Jurisdiction and power are not interchangeable although judges and lawyers often confuse them[.] Jurisdiction relates solely to the competency of the particular court or administrative body to determine controversies of the general class to which the case then presented for its consideration belongs. Power, on the other hand, means the ability of a decision-making body to order or effect a certain result.

**Domus, Inc. v. Signature Bldg. Sys. of PA, LLC**, 252 A.3d 628, 636 (Pa. 2021) (holding procedural failure divested the trial court of "authority to order relief in the particular case before it" but did not divest the court of subject matter jurisdiction "to consider the general class of" the type of action at issue).

Phrased differently, subject matter jurisdiction concerns the court's authority to consider cases of a given nature and grant the type of relief requested. **Harley v. HealthSpark Foundation**, 265 A.3d 674 (Pa.Super. 2021). It "is defined as the power of the court to hear cases of the class to which the case before the court belongs, that is, to enter into inquiry, whether or not the court may ultimately grant the relief requested." **Id**. at 687.

A challenge to a court's subject matter jurisdiction raises a question of law, which we review *de novo*. **Id**. Our scope of review is plenary. **Id**.

The various divisions of Pennsylvania's "Courts of Common Pleas have unlimited original jurisdiction over all proceedings in this Commonwealth, unless otherwise provided by law." **Beneficial Consumer Discount Co. v. Vukman**, 77 A.3d 547, 552 (Pa. 2013); **see also** 42 Pa.C.S. § 931(a)("Except where exclusive original jurisdiction of an action or proceeding is by statute . . . vested in another court of this Commonwealth, the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings, including all actions and proceedings heretofore cognizable by law or usage in the courts of common pleas."). It is beyond cavil that the Courts of Common Pleas are competent to entertain parentage claims. **See e.g.**, **S.M.C. v. C.A.W**., 221 A.3d 1214 (Pa.Super. 2019) (affirming parentage determination by the court of common pleas based upon application of the doctrine of paternity by estoppel); **DeRosa v. Gordon**, 286 A.3d 321, 331 (Pa.Super. 2022) (affirming court of common plea's parentage orders granting DNA testing); **V.L.-P. v. S.R.D.**, 288 A.3d 502 (Pa.Super. 2023) (vacating portion of court of common pleas order denying genetic testing and remanding for further proceedings concerning genetic testing and claims of fraud); **see also** 23 Pa.C.S. §§ 4343 (providing procedures for court of common pleas to determine parentage of child born out of wedlock) and 5102-5104 (concerning determination of parentage, acknowledgment and claim of parentage, and

blood tests to determine parentage). Accordingly, Glover's jurisdictional challenge fails.

Moreover, to the extent that Glover contests the trial court's statutory **authority** to grant the pre-birth establishment of parentage under the purview of the Code, this non-jurisdictional challenge is, in fact, waived pursuant to Pa.R.A.P 302(a) because Glover failed to raise it during the evidentiary hearing. ***See Stange v. Janssen Pharm., Inc.***, 179 A.3d 45, 63 (Pa.Super. 2018) (explaining, "Even if an issue was included in a subsequently filed motion for reconsideration, issues raised in motions for reconsideration are beyond the jurisdiction of this Court and thus may not be considered by this Court on appeal.") (cleaned up). Furthermore, as discussed *infra*, even if Glover had raised and preserved a challenge to the trial court's statutory authority, that claim would find no purchase here.

In pertinent part, the Code outlines the court's jurisdiction as such:

> **(a) Jurisdiction.--**The courts shall have original jurisdiction in cases of divorce and for the annulment of void or voidable marriages and shall determine, in conjunction with any decree granting a divorce or annulment, the following matters, if raised in the pleadings, and issue appropriate decrees or orders with reference thereto, and may retain continuing jurisdiction thereof:
>
> . . . .
>
> (5) Any other matters pertaining to the marriage and divorce or annulment authorized by law and which fairly and expeditiously may be determined and disposed of in such action.

23 Pa.C.S. § 3104.

Similarly, the Code grants the court the following equitable powers:

**(f) Equity power and jurisdiction of the court.--**In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this part and may grant such other relief or remedy as equity and justice require against either party or against any third person over whom the court has jurisdiction and who is involved in or concerned with the disposition of the cause.

23 Pa.C.S. § 3323.[4]

---

[4] Our legislature outlined the purpose of the Code as follows:

(a) **Policy**.--The family is the basic unit in society and the protection and preservation of the family is of paramount public concern. Therefore, it is the policy of the Commonwealth to:

(1) Make the law for legal dissolution of marriage effective for dealing with the realities of matrimonial experience.

(2) Encourage and effect reconciliation and settlement of differences between spouses, especially where children are involved.

(3) Give primary consideration to the welfare of the family rather than the vindication of private rights or the punishment of matrimonial wrongs.

(4) Mitigate the harm to the spouses and their children caused by the legal dissolution of the marriage.

(5) Seek causes rather than symptoms of family disintegration and cooperate with and utilize the resources available to deal with family problems.

(6) Effectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights.

*(Footnote Continued Next Page)*

Instantly, it is indisputable that, with all matters filed pursuant to the Code, the court of common pleas had authority according to 23 Pa.C.S. § 3104 to confront Junior's petitions, rule on the merits of the matters at hand, and grant the requested relief.  In addition, to the extent that Glover's challenge is founded upon the fact that her divorce complaint did not specifically plead custody or parentage, as she argues is required to trigger § 3104(a), generally, her argument is unavailing.  Regardless of the putative prerequisites Glover seeks to invoke to preclude the court from exercising its authority under § 3104, in light of the circumstances of this case and the significance of the parentage issue to both parties, the trial court acted squarely within the equitable powers conferred by the § 3323(f) catchall provision granting courts in matrimonial cases full equity and jurisdiction to protect the interests of the parties.[5]  Thus, this authority-based challenge also fails.

_____

**(b) Construction of part**.--The objectives set forth in subsection (a) shall be considered in construing provisions of this part and shall be regarded as expressing the legislative intent.

23 Pa.C.S. § 3102.

[5] Similarly, we reject Glover's justiciability challenge based on the ripeness doctrine.  Framing the matter as implicating custody and/or parentage of a then-unborn child, as opposed to contractual rights, she contends that the issues were not ripe when the trial court addressed Junior's petition for relief. We disagree.  As the trial court accurately observed in rejecting this contention below, this Court "recognized a pre-birth cause of action [for parentage based] in contract law in **In Re Baby S**., 128 A.3d 296 (Pa.Super 2015)[.]"  Trial Court Opinion, 8/1/22, at 12.

Accordingly, we turn to the substance of this appeal, observing at the outset that we review orders relating to parentage for an abuse of discretion or an error of law. *See*, *e.g.*, *J.L. v. A.L.*, 205 A.3d 347, 353 (Pa.Super. 2019). The crux of Glover's argument is that the trial court erred in applying contract principles to determine parentage. Essentially, she claims that Pennsylvania jurisprudence "established a narrow framework for establishing parentage in the absence of adoption or biology[,]" and the trial court summarily concluded, "without legal or factual support, that [Junior] is a legal parent . . . under contract principles." *See* Glover's brief at 23-24.

Mindful of our authority to affirm a trial court on any basis supported by the record, we first examine whether the order establishing Junior's parentage is sustainable through "application of the presumption of parentage married persons enjoy," which we refer to herein as the marital presumption.[6] *C.G. v. J.H.*, 193 A.3d 891, 905 n.12 (Pa. 2018). Pursuant to that doctrine, "generally, a child conceived or born during the marriage is presumed to be

---

[6] The trial court specifically declined to apply the doctrine in this case. *See* Trial Court Opinion, 8/1/22 at 13 ("Here, the [c]ourt did not apply [the presumption] in reaching its determination that Junior is the legal parent of Child. Rather, the Court appropriately applied the law of contracts and established Pennsylvania case law to determine that the parties' actions evidenced the intent and the accomplishment of securing Junior's status as a legal parent."). Nevertheless, it is axiomatic that this Court can affirm the trial court order for any reason supported by the certified record. *See D.M. v. V.B.*, 87 A.3d 323, 330 n.1 (Pa.Super. 2014). Therefore, because Junior and the *amicus curiae* both advocate this well-settled doctrine as a basis for affirmance, we consider it at the outset.

the child of the marriage; this presumption is one of the strongest presumptions of the law of Pennsylvania[.]" *Brinkley v. King*, 701 A.2d 176 (Pa. 1997) (plurality). Indeed, as our Supreme Court explained, "in one particular situation, no amount of evidence can overcome the presumption: where the family (mother, child, and [spouse]) remains intact at the time that the [spouse's parentage] is challenged, the presumption is irrebuttable." *Strauser v. Stahr*, 726 A.2d 1052, 1054 (Pa. 1999).

The presumption is equally applicable to same-sex and opposite-sex spouses. *See Interest of A.M.*, 223 A.3d 691, 695 (Pa.Super. 2019). However, for both types of spouses, since the purpose of the marital presumption is to preserve the inviolability of the intact marriage, "[w]hen there is no longer an intact family or a marriage to preserve, then the presumption . . . is not applicable." *Vargo v. Schwartz*, 940 A.2d 459, 463 (Pa.Super. 2007); *K.E.M. v. P.C.S.*, 38 A.3d 798, 806-07 (Pa. 2012) ("As to the [marital presumption], we note only that recent Pennsylvania decisions have relegated it to a substantially more limited role, by narrowing its application to situations in which the underlying policies will be advanced (centrally, where there is an intact marriage to be protected).")

As it relates to the determination of what constitutes an intact family for the purposes of the doctrine's applicability, our High Court has held that the presumption does not apply where the parties had finalized the divorce prior to the parentage dispute. *See Fish v. Behers*, 741 A.2d 721, 723 (Pa. 1999)

(adopting the plurality's reasoning in **Brinkley**, **supra**; "In this case, there is no longer an intact family or a marriage to preserve. Appellant and her husband have been divorced since December of 1993."). Likewise, this Court found that a long-term separation without a finalized divorce would foreclose the doctrine's application. **See e.g.**, **J.L.**, **supra** at 357 (finding that the record supports trial court's conclusion that marital presumption did not apply where couple represented that they were separated, rented a separate apartment, and considered divorce); **Vargo**, **supra** at 463 (collecting cases where appellate courts concluded presumption did not apply because marriages were not intact despite the lack of final divorce decree); **T.L.F. v. D.W.T.**, 796 A.2d 358, 362 at n.5 (Pa.Super. 2002) ("We specifically note that the fact Appellee and D.F. are not divorced is not determinative in this case. We have also held that the presumption is inapplicable where the parties were separated but not divorced.").

Conversely, in **Interest of A.M.**, **supra** at 695, we concluded that the trial court did not err in applying the presumption to a marriage that had been beset by domestic violence because, although the parties previously contemplated separation, they intended to remain married when the issue of parentage was raised. We explained,

> It is readily apparent from the record that the marriage between P.M.-T. and Mother is riddled with challenges and difficulties. Under our case law, though, the existence of troubles in a marriage – even one as serious and disturbing as domestic violence - does not mean that such a marriage is not intact for

purposes of determining the applicability of the [marital] presumption[.]

*Id*. at 695-96. The High Court reached a similar conclusion in ***Strauser***, ***supra*** at 1055–56, holding that the presumption applied where the couple remained committed to the marriage despite infidelity. ***See also E.W. v. T.S.***, 916 A.2d 1197, 1204 (Pa.Super. 2007) (same); ***B.C. v. C.P.***, 300 A.3d 321 (Pa. 2023) (granting allowance of appeal to determine "whether the lower courts erred in placing paramount importance on periods of separation in determining that the presumption of paternity was inapplicable, despite the marital couple's reconciliation which predated the third-party's paternity action.").

In this case, Glover and Junior had been married for approximately seven months when the child was conceived, but they separated prior to birth. The trial court observed that the couple "experienced marital difficulties and sought counseling." Trial Court Opinion, 8/1/22, at 3. It also noted that Glover "described Junior as having 'immense emotional needs,' 'a lot of triggers' and as 'volatile,' 'toxic, 'controlling,' and manipulative." *Id*. (citing N.T., 5/3/22, at 59, 65)) (cleaned up). Junior "intended to move out of the residence when the. . . lease expired on July 31, 2022." *Id*. at 4 (citing N.T. 5/3/22, at 38-39). Glover initiated divorce proceedings before Junior filed the petitions to determine pre-birth parentage that underlie this appeal, and the divorce remained pending when the trial court determined that Junior had a

contract-based right to parentage. The certified record does not reveal the present status of the marriage.

Applying these facts to the above-stated paradigm, it is apparent that employing the marital presumption would not serve the purpose of the doctrine, *i.e.*, to preserve an intact marriage. We recognize that the onset of the divorce proceedings is not determinative of this issue where, as here, the marriage had not yet been dissolved when parentage was placed at issue. Nevertheless, the filing of a divorce complaint is particularly relevant considering the trial court's factual findings concerning the parties' marital strife and intra-residence separation, and Junior's aim to move out of the residence two months after the child's anticipated due date.

While this Court determined in *Interest of A.M.* that elevated marital discord did not require *ipso facto* a finding that the marriage was not intact for the purposes of determining the marital presumption's applicability, overall, the facts of the case at bar align with the cases finding that the various marriages were no longer intact. *See e.g.*, *J.L.*, *supra* at 357-58 (affirming trial court decision to forgo marital presumption); *Barr v. Bartolo*, 927 A.2d 635, 643 (Pa.Super. 2007) ("[W]hile the parties remain married, there concededly is no intact family to preserve; hence, the [marital] presumption . . . is not applicable."); *Doran v. Doran*, 820 A.2d 1279, 1283 (Pa.Super. 2003) ("Because a divorce action was pending . . ., there was no longer an

intact family or marriage to preserve, and, therefore, the [marital] presumption . . . is inapplicable to the present case.").

Stated plainly, unlike the facts underlying the cases upholding the doctrine's application based upon the spouses' commitment to their nuptials notwithstanding marriage-related turmoil, the instant case lacks this galvanizing element. As recounted by the trial court's factual findings, the certified record demonstrates that the marriage was over at the time parentage was placed at issue. Hence, we find that the trial court did not abuse its discretion in failing to apply the marital presumption in this case.

Turning to the legal basis for the trial court's decision to confirm Junior's status as the child's legal parent, the trial court determined that the parties formed a binding agreement that imbued Junior with parental rights. *See* Trial Court Opinion, 8/1/22 at 9-10 ("Based upon the undisputed evidence presented, the [c]ourt determined that it conclusively established that the parties, a married couple, formed a binding agreement for Junior, as a non-biologically[-]related intended parent, to assume the status of legal parent to the [c]hild [conceived] through the use of assistive reproductive technology [('ART')]."). We next address Glover's arguments assailing that conclusion.

Whether individuals can enter into an enforceable agreement to determine parentage and parental rights involves a legal question that we review *de novo*. *Ferguson v. McKiernan*, 940 A.2d 1236 1242 (Pa. 2007) (holding that appellate courts employ *de novo* review of pure question of law

concerning whether would-be mother and willing sperm donor can enter into an enforceable agreement to delineate parental rights and obligations). Our scope of review is plenary. *Id*.

As this Court recognized in *Reformed Church of the Ascension v. Hooven & Sons, Inc.*, 764 A.2d 1106, 1109 (Pa.Super. 2000), "[t]he policy behind contract law is to protect the parties' expectation interests by putting the aggrieved party in as good a position as he would have been had the contract been performed." (citing Restatement (Second) of Contracts § 344(a) (1979) (approved in *Trosky v. Civil Service Commission*, 652 A.2d 813, 817 (Pa. 1995)). Whether oral or written, a contract requires three essential elements: (1) mutual assent; (2) consideration; and (3) sufficiently definite terms. *See e.g.*, *Helpin v. Trustees of Univ. of Pennsylvania*, 969 A.2d 601, 610 (Pa.Super. 2009).

Furthermore,

[a]n agreement is expressed with sufficient clarity if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate remedy. Accordingly, not every term of a contract must always be stated in complete detail. If the parties have agreed on the essential terms, the contract is enforc[ea]ble even though recorded only in an informal memorandum that requires future approval or negotiation of incidental terms. In the event that an essential term is not clearly expressed in their writing but the parties' intent concerning that term is otherwise apparent, the court may infer the parties' intent from other evidence and impose a term consistent with it.

*Id*. at 610-11 (cleaned up) (quotations and citations omitted).

As to our consideration of contract terms when a written agreement is involved, "[t]his Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation. ***Humberston v. Chevron U.S.A., Inc.***, 75 A.3d 504, 509–10 (Pa.Super. 2013) (internal quotation marks and citations omitted). Likewise, "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." ***Sw. Energy Prod. Co. v. Forest Res., LLC***, 83 A.3d 177, 187 (Pa.Super. 2013) (quoting ***Huegel v. Mifflin Const. Co., Inc.***, 796 A.2d 350, 354–355 (Pa.Super. 2002)).

Herein, the trial court concluded that Junior was a legal parent based upon principles of contract law. Glover urges us to reach the opposite position by attempting to distinguish the facts of the instant case from the circumstances involved in the three cases that the trial court relied upon in fashioning Junior's contractual rights to parentage: ***C.G. v. J.H.***, ***supra***; ***Ferguson***, ***supra***; and ***In Re Baby S***., 128 A.3d 296 (Pa.Super 2015).

We address the relevant precedential authority chronologically. In ***Ferguson***, a prospective mother and a sperm donor entered into an oral agreement pertaining to parentage. Specifically, the parties agreed that the sperm donor would be released from parental obligations of the children produced from the mother's IVF treatment. In exchange, the mother agreed

not to seek child support. However, she subsequently changed her mind and sued the biological father for child support of the twins born of the accord and IVF treatment. The trial court denied relief, holding that the agreement was unenforceable as against public policy because a parent cannot bargain away a child's right to support. We affirmed, but our Supreme Court upheld the oral contract observing that "constantly evolving science of reproductive technology . . . undermines any suggestion that the agreement at issue violates [public policy]." **Ferguson**, **supra** at 1248. Hence the High Court held that the agreement was binding and enforceable against both biological parents. **Id**. ("[I]n considering as we must the broader implications of issuing a precedent of tremendous consequence to untold numbers of Pennsylvanians, we can discern no tenable basis to uphold the trial court's support order.").

Subsequently, in **In re Baby S.**, this Court reviewed the enforceability of a surrogacy agreement between a married couple and a gestational surrogate. The couple entered into a service agreement for IVF treatment that identified them as "Intended Parents" and matched them with a gestational carrier. The couple entered a second contract with a gestational carrier, also identifying them as the intended parents, that obligated them "to accept custody and legal parentage of any Child born pursuant to this Agreement." **In re Baby S., supra**, at 300. In turn, the second contract specified that "[t]he Gestational Carrier shall have no parental or custodial

rights or obligations of any Child conceived pursuant to the terms of this Agreement." *Id*.

After the child was born, the couple experienced marital difficulties and the wife sought to rescind the agreement, arguing that the gestational carrier contract was unenforceable. Relying upon *Ferguson*, the trial court declared the couple as the legal parents of Baby S. *Id*. at 301. The wife appealed, and we upheld the trial court's order confirming parentage, reasoning as follows:

> The *Ferguson* Court expressly recognized the enforceability of a contract that addressed parental rights and obligations in the context of [ART], which in that case involved sperm donation. The Court acknowledged "the evolving role played by alternative reproductive technologies in contemporary American society." The Court acknowledged "non-sexual clinical options for conception ... are increasingly common in the modern reproductive environment" and noted that the legislature had not prohibited donor arrangements despite their "growing pervasiveness." The Court's language and focus on the parties' intent is at odds with Appellant's position that gestational carrier contracts, a common non-sexual clinical option for conceiving a child, violate a dominant public policy based on a "virtual unanimity of opinion."

*Id*. at 306 (cleaned up).

Finally, in *C.G.*, our Supreme Court confronted whether an unmarried, former same-sex partner had standing as a "parent" pursuant to § 5324(1) of the Child Custody Act, to seek custody of a child who was conceived via intrauterine insemination using an anonymous sperm donor. C.G., who shared no genetic connection with the child and never pursued adoption, argued that she had standing because she acted as a mother to the then nine-

year-old child, whom she argued was conceived with the mutual intent of both parties to co-parent. C.G. also asserted that her continued involvement served the child's best interests.

J.H., the biological mother, filed preliminary objections to the custody complaint wherein she argued that C.G. lacked standing because she was not the child's parent or grandparent and did not stand in *loco parentis* to the child. Moreover, J.H. disputed that she conceived the child with the intent to co-parent with C.G. and highlighted that she satisfied nearly all of the child's financial needs, served as the sole parent since birth, and "made all decisions regarding the child's education, medical care, growth and development[.]" *C.G.*, *supra*, at 894 (quoting Prelim. Objections, 1/6/16, at ¶¶ 7-11.).

Following a three-day evidentiary hearing addressing "C.G.'s participation in the conception, birth, and raising of [the c]hild, [and] the intent of the parties with respect thereto," the trial court sustained the preliminary objections. *Id*. at 894-95. Specifically, as to the parties' intent to co-parent, the trial court found no shared intent to conceive and raise the child collectively. Hence, the court was persuaded that C.G. was not a parent and J.H. did not hold her out as one to others. *Id*. at 896.

C.G. appealed the order dismissing the custody complaint, and we affirmed. The Supreme Court granted allowance of appeal to consider, *inter alia*, whether the former same-sex partner had standing "to seek custody of a child born during her relationship with the birth mother where the child was

conceived via assisted reproduction and the parties lived together as a family unit for the first five years of the child's life." *Id*. at 897-98.

In affirming the court's rejection of C.G.'s standing claim, the High Court held that Pennsylvania jurisprudence limits recognition of legal parentage to biology, adoption, judicial presumptions associated with intact marriages, and "contract—where a child is born with the assistance of a donor who relinquishes parental rights and/or a non-biologically related person assumes legal parentage[.]" *Id.* at 904. As C.G. had no biological connection to the child, had not officially adopted the child, and did not have rights that have been recognized as affording legal parentage, the High Court concluded that she was not a parent.[7]

Significantly, however, the Court continued:

[N]othing in today's decision is intended to absolutely foreclose the possibility of attaining recognition as a legal parent through other means. However, under the facts before this Court, this case does not present an opportunity for such recognition, **as the trial court found as fact that the parties did not mutually intend to conceive and raise a child, and the parties did not jointly participate in the process.**

*Id*. at 904 n.11 (emphasis added).

---

[7] As the parties were unmarried and "declined to seek recognition of their union by registering as domestic partners [or] . . . pursue adoption . . . while the relationship was still intact[,]" the High Court did not speculate about whether their informal commitment ceremony "should compel the application of the presumption of parentage married persons enjoy." *C.G. v. J.H.*, 193 A.3d 891, 905 n.12 (Pa. 2018).

Cognizant of the foregoing framework, we address Glover's contention that the trial court erred in concluding that Junior had a contract-based right to parentage. For the following reasons, we affirm the court's finding that Junior established a contract-based right to parentage, as evidenced by the couple's collective intent and shared cost in conceiving a child via ART.

As previously noted, while parentage is typically established biologically or through formal adoption, in cases involving ART, "contracts regarding the parental status of the biological contributors must be honored in order to prohibit restricting a person's reproductive options." **C.G. supra** at, 903-04 (cleaned up). Our High Court further instructed, "[t]here is nothing to suggest in our case law that two partners in a same-sex couple could not similarly identify themselves each as intended parents, notwithstanding the fact that only one party would be biologically related to the child." **Id**. at 904, n.11.

An examination of the documents and testimony presented during the evidentiary hearing reveals a sufficient basis, as evidenced by the agreements and the conduct of the parties, to confer parentage on Junior. First, insofar as Junior was required to, and did, in fact, initial or sign as "partner" the substantive pages of the couple's IVF agreement with RMA Fertility, Junior was a party to that contract. Indeed, the written accord expressly required Junior to execute the contract and noted that "if during the term of this Agreement there occurs a change in legal or other status (*i.e.*, divorce, legal separation or annulment) . . . you will be deemed to have self-withdrawn from

the Program, and you will not be entitled to a refund." RMA Fertility Agreement, 7/11/21, at 6. Concomitantly, the joint agreement also directed that by executing the contract, Junior assumed the financial obligation of participating in the fertility program, a cost that the couple split equally. Thus, rather than being the mere signatory that Glover suggests, Junior was an essential party to the contract and subject to the obligations, constraints, and liabilities outlined therein.

Similarly, although not a signatory to the agreement, Junior was a beneficiary of the couple's agreement with Fairfax Cryobank that identified Junior as a "co-intended parent," relinquished the rights of the sperm donor, and conveyed parental rights to the child born of the donated sperm. This agreement evinced the couple's express intent that Junior would be bound by the terms and conditions embodied therein.[8]

_____

[8] The following considerations are relevant to our determination concerning whether an individual is a third party beneficiary to a contract:

> (1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties, and

> (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

***Porter v. Toll Bros., Inc.***, 217 A.3d 337, 349 (Pa. Super. Ct. 2019) (*quoting* ***Burks v. Fed. Ins. Co.***, 883 A.2d 1086, 1088 (Pa.Super. 2005). Instantly, at the time of contract formation, the Fairfax Cryobank Contract designated Junior a co-intended parent and the circumstances of the couple's mutual
*(Footnote Continued Next Page)*

In addition to the two assistive fertilization agreements that demonstrated the couples' shared agreement, Glover and Junior retained legal counsel in anticipation of Junior's "Confirmatory Step-Parent Adoption" of their son. Engagement Letter, 10/13/21 at 1. Again, they shared the cost of representation and the engagement letter contained an addendum regarding joint representation that disclosed the risk inherent to collective representation. *Id*. at Addendum—Consent Regarding Joint Representation. Likewise, the couple jointly hired a doula, again splitting the fee, pursuant to an agreement that identified both parties as "Client." N.T., 5/3/22, Exhibit M at unnumbered 6.

Overall, the foregoing contracts, all of which either referenced Junior as a party or made her a beneficiary, served as evidence that Junior and Glover intended to collectively assume legal parentage of the child born via artificial reproductive technology. Phrased differently, the various agreements bear out the reality that Junior would be the child's second parent.

In addition to the parties' mutual intent, which permeated the ART agreements, the conduct of Glover and Junior further evinces the existence of an oral contract between them. As noted *supra*, there are three elements of a contract: (1) mutual assent; (2) consideration; and (3) sufficiently definite

---

effort to procure sperm from a specifically-selected donor in anticipation of the IVF procedure manifested Glover's intent to bestow upon Junior the terms and conditions of the agreement with Fairfax Cryobank.

terms. **Helpin**, **supra** at 610. Presently, the certified record is replete with evidence of the parties' mutual assent to conceive a child of their marriage using ART, bestow upon Junior legal parent status, and raise the child together as co-parents. **See** Trial Court Opinion, 8/1/22, at 9-10. Additionally, as discussed above, unlike the facts that the Supreme Court confronted in **C.G. supra**, where "[t]here was no dispute that [the former same-sex partner] was not party to a contract or identified as an intended-parent[,]" Junior satisfied both these components. **Id**. at 904. The only remaining question is whether the oral agreement was supported by consideration or some other form of validation. For the reasons that follow, we find that it was.

In **Pennsylvania Envtl. Def. Found. v. Commonwealth**, 255 A.3d 289, 305 (Pa. 2021), our Supreme Court explained that "[c]onsideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." (citations omitted).

During the evidentiary hearing on Junior's petition, Junior confirmed paying for one-half of all the expenses, including fees associated with the preliminary medical tests, IVF, and hiring a doula to assist Glover during the birth. **See** N.T., 5/3/22, at 17, 44. When asked about the extent of the equally shared costs, Junior declared, "**Everything**: the IVF, the doula, the second parent adoption, everything. Everything." **Id**. at 44 (emphasis in original).

Junior also described the shared emotional role, noting how, for three months, Junior was required to administer daily fertility injections into Glover's abdomen in anticipation of having her eggs removed for fertilization. *Id*. at 18-19. After the pregnancy was confirmed, Junior administered daily dosages of progesterone to help prevent miscarriages. *Id*. at 19. Additionally, Junior regularly accompanied Glover to the obstetrician. *Id*. at 20. Junior summarized their collective preparations as follows:

> But every week, we would have to go to RMA for more bloodwork just to make sure the progesterone levels were correct, that everything was coming along [as planned], and also doing sonograms.
>
> And then, finally, we had completed [ART]. Like I said, I gave the injections for over three months, but now we were able to go directly to Thomas Jefferson [University Hospital], who we decided together would be our OB. That's where we would give birth.
>
> . . . .
>
> So, for a year, this was a constant -- for the entire year of 2021, us bringing our child into the world was a constant in our lives.
>
> Although . . . we weren't pregnant before July, he was still part of our family because we were doing everything we could every week to make sure that we had him. And then once we conceived, we were doing everything we could every day for the . . . remainder of the year to make sure that he stayed with us through these injections, through going to the hospital, making sure he was okay, monitoring his heart, hearing his heartbeat, so forth and so on.
>
> I'm sorry I was long-winded, but really, it was a very long process, and I was there for every step of it.

*Id*. at 21-20.

Glover not only agreed to the shared financial and emotional burdens, she continued to assent to the arrangement even after doubting whether she was still committed to co-parenting with Junior. *Id*. at 59. Glover addressed this apparent dichotomy during the evidentiary hearing. She offered the following explanation for why, despite her apprehensions about continuing her romantic relationship with Junior, she nevertheless executed the fertility contracts identifying Junior as a co-parent rather than proceeding alone or forgoing the IVF program entirely: "I could've moved forward without having to do the [IVF] program. . . . Financially—it was the best decision." *Id*. at 65. Hence, the certified record bears out that, in exchange for the consideration of the shared emotional burden and equally-divided financial cost of the assistive reproductive procedure and birth, Glover agreed that her spouse, Junior, would possess parental rights to the child conceived through their combined efforts.

In light of the express contractual obligations outlined between the parties in the Fairfax Cryobank Contract that identified Junior as the "co-intended Parent" and the couple's IVF agreement with RMA Fertility, which Junior executed as the "Partner," as well as all of the joint steps taken by the parties to prepare for the birth of the child, we hereby recognize the oral contract between Junior and Glover concerning parentage. The foregoing exchange of promises is not so vague or ambiguous as to preclude a legal contract because one of the parties did not expect legal consequences to flow

from their agreement.[9]  Indeed, in rejecting Glover's protestation that she, in fact, did not intend to bestow any legal rights upon Junior, the trial court was incredulous.  It proclaimed, "[t]o the extent that Glover alleges she[, an attorney,] was unable to legally consent to a contract or understand the terms of the contracts that she signed, these allegations are either unproven, not credible [or] waived as she has not raised the same on appeal."  Trial Court Opinion, 8/1/22, at 10.

The certified record sustains the trial court's credibility assessment.  In fact, approximately five months after Glover initiated the IVF program with Junior's financial contributions and emotional support, Glover ratified the couple's arrangement by executing a December 2021 affidavit, which noted the then-anticipated adoption and further endorsed Glover's desire for Junior to "become a legal parent, with rights equal to [Glover's] rights as a biological

_____

[9] While nothing in the oral agreement specifically provided that Junior was to be listed on the child's birth certificate, that proviso was unnecessary as, pursuant to current Pennsylvania guidelines, the biological parent's spouse is automatically listed as the other parent on the birth certificate.  **See** https://www.health.pa.gov/topics/certificates/Pages/New-Parent.aspx  ("If you were married at the time of your child's birth, then the birthing parent's spouse is the child's legal parent unless a specialized registration process has been used to list a biological parent on your child's birth record.").  This guideline is the modern application of the antiquated regulation, entitled "Registration as other than the child of the mother's husband," which requires, *inter alia*, the submission of an affidavit in order to avoid naming the spouse as a parent or to register a different individual as parent.  **See** 28 Pa.Code § 1.5.; **see also** BUREAU OF HEALTH STATISTICS AND REGISTRIES, PENNSYLVANIA'S BIRTH REGISTRATION POLICY MANUAL, August 2021, at 21 (affidavit required "under the Vital Statistics Law when a married birthing parent decides to not name a legal spouse as the other parent of the child.").

parent." Glover Affidavit, 12/2/21, at 1 ¶4. The affidavit continued, "I want Nicole Shawan Junior to become a legal parent to this child because I believe it is in the best interest of the child." *Id*. at ¶10. In light of Glover's recurring statements of assent, the certified record supports the trial court's finding that Glover fully understood the extent of the agreement.

Thus, as outlined *supra*, we find that Junior has an enforceable right to parentage under principles of contract law. The certified record demonstrates the parties' mutual assent, actions in furtherance of the sufficiently definite terms of the agreement, and consideration. [10]

---

[10] Assuming *arguendo*, that Junior did not have a contractual right to parentage, relief is also warranted under the court's equitable power. Phrased differently, Glover's actions and representations regarding the child's anticipated parentage were grounds under the doctrine of equitable estoppel to preclude her from challenging Junior's parentage. This is not an entirely novel application of the doctrine. As we observed in explaining the roots of the related doctrine of paternity by estoppel, "In simplistic terms, the doctrine of equitable estoppel upon which paternity by estoppel is based is one of fundamental fairness such that it prevents a party from taking a position that is inconsistent to a position previously taken and thus disadvantageous to the other party." *See C.T.D. v. N.E.E*, 62, 653 A.2d 28, 31 (Pa.Super. 1995) (cleaned up).

Equitable estoppel binds a party to the implications created by their words, deeds or representations. In *L.S.K. v. H.A.N.*, 813 A.2d 872, 877 (Pa.Super. 2002), we explained,

> Equitable estoppel applies to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken. Equitable estoppel, reduced to its essence, is a doctrine of fundamental fairness designed to preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit

*(Footnote Continued Next Page)*

Alternatively, even if the record did not establish the three elements of contract, we would affirm the trial court order pursuant to the application of "intent-based parentage" that the High Court recognized but was unable to adopt under the facts extant in **C.G.**, **supra** at 904 n.11. Specifically, the Court observed, "this case does not present an opportunity for [finding an alternative approach to parentage], as the trial court found as fact that the parties did not mutually intend to conceive and raise a child, and the parties did not jointly participate in the process." **Id**. The respective concurring opinions of Justices Dougherty and Wecht outlined their perspectives of intent-based parentage, but nonetheless agreed that the factual record did not warrant its application in that case. In this vein, Justice Dougherty reasoned that it was not necessary "to endorse any particular new test" because the Court was bound by the factual findings that there was no mutual intent to conceive and raise a child, or evidence of shared participation in the

_____

gratuitously knew or should have known that the other would rely upon that conduct to his detriment.

**Id**. (cleaned up).

Instantly, Glover's actions and representations throughout the technologically-assisted pregnancy demonstrated her assent to Junior's parentage. The record bears out Junior's detrimental reliance and endurance of severe prejudice if Glover were permitted to deny parentage at this juncture. Thus, in addition to affirming the trial court's analysis of the parties' respective contractual rights, we find the alternative grounds to affirm the trial court's order as a matter of equity. **See C.T.D.**, **supra** at 31 ("Principles of estoppel are peculiarly suited to cases where . . . no presumptions of paternity apply.")(cleaned up).

reproductive process. He further noted that those findings "preclude a holding that C.G. has standing as a parent under any of the proffered definitions of intent-based parentage." *Id*. at 913.

Justice Wecht, joined by Justice Donohue, observed that "[r]eliance solely upon biology, adoption and contracts is insufficient" in some situations and articulated his comprehensive perspective that, "in cases involving [ART], courts must probe the intent of the parties." *Id*. at 913-14 (footnote omitted). However, he too was constrained to concur with the majority's decision based upon the trial court's findings of fact. Justice Wecht explained,

> While I would embrace an intent-based test for parentage for persons pursuing parentage through ART, I nonetheless concur with the Majority's determination that C.G. was not a parent under the facts of this case as found by the trial court. As the Majority notes, the **trial court found that J.H. was credible when she testified that C.G. never intended to be a parent to Child and that C.G. did not act as a parent**. Further, the trial court credited testimony that **C.G. and J.H. reached no mutual decision to become parents.** Given that there was no documentary evidence of C.G.'s intent to parent, and given that the trial court found, consistent with the record, that C.G.'s actions were not those of a parent, I join the Majority's conclusion that C.G. did not have standing as a parent pursuant to 23 Pa.C.S. § 5324.

*Id*. at 917 (emphases added, footnotes omitted). Overall, Justice Wecht concluded, "I think that today's case is a missed opportunity for this Court to address the role of intent in analyzing parental standing in ART cases." *Id*. at 918.

The facts of this case, however, provide another opportunity.[11]  Here, our review of the certified record in this appeal easily supports a finding of parentage by intent.  Indeed, Glover consistently represented over a thirteen-month period that she intended to share with Junior parentage of the couple's child conceived through ART.  As previously discussed, Glover contracted with Fairfax Cryobank and RMA Fertility and she assented to identifying Junior as the "co-intended Parent" and "Partner," respectively.  Even after doubting her romantic commitment to Junior, Glover continued to pursue the pregnancy with Junior's financial assistance and shared emotional burden.

_____

[11] Notwithstanding the apprehension expressed in the Concurring Opinion about exceeding our authority as an intermediate appellate court by applying an intent-based approach in this case, it is beyond cavil that this Court regularly confronts matters of first impression.  *See e.g.*, *Reber v Reiss*, 42 A.3d 1131, 1134 (Pa.Super. 2012) (addressing issue of first impression that arose as a result of advances in reproductive technology, *i.e.*, "the contested disposition of frozen pre-embryos in the event of divorce").  Thus, while the Concurring Opinion accurately outlines the limitations of our authority as an error-correcting court, when we are addressing a matter of first impression, which, by definition, means there is an absence of clear precedent, "our role as an intermediate appellate court is to resolve the issue as we predict our Supreme Court would" address it.  *Ridgeway ex rel. Estate of Ridgeway v. U.S. Life Credit Life Ins. Co.*, 793 A.2d 972, 975 (Pa.Super. 2002); *see also Vosk v. Encompass Ins. Co.*, 851 A.2d 162, 165 (Pa.Super. 2004) (*quoting* *Ridgeway*, *supra* at 975); *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 15 (Pa.Super. 2002) ("when presented with an issue for which there is no clear precedent, our role as an intermediate appellate court is to resolve the issue as we predict our Supreme Court would do.").  Consistent with the foregoing authority, we resolve the novel issue presented in this appeal by applying the principles of parentage by intent that Justices Dougherty and Wecht discussed in *C.G.*, *supra*.

Glover further led her spouse to believe that they would share parentage. Junior participated in the decision to conceive their son with the shared intent to raise him together. Likewise, Junior consistently identified as an intended parent, and with Glover's express consent and endorsement, Junior performed the role of an expectant parent, including participating in the selection of the sperm donor and naming their child after conception. During the evidentiary hearing, Junior testified that, in the role as the "co-intended Parent" under the Fairfax Cryobank contract, the couple collectively selected a sperm donor from Fairfax Cryobank based specifically on the donor's physical appearance, interests, and genetic lineage. *Id*. at 25. Junior explained, "We were looking for sperm donors who . . . resembled me as much as possible, because we . . . were us[ing] [Glover's] egg, and we wanted our child to look as much like both of us as possible." *Id*. Thus, in identifying a photograph of the sperm donor, Junior observed, "he's dark-skinned, like I am. He has almond shaped eyes like I do. He has a huge . . . wide smile like I do. He has high cheekbones like I do. In addition to that when we looked more deeply into the details, he's a Sagittarius like I am." *Id*. at 26. In addition, both the donor and Junior traced their indigenous history to Benin, Africa. *Id*. In all, Junior stated, "primarily, it was because . . . we shared so much in common—the donor and I—and [Glover] and I both kept remarking on how [it was] kismet . . . [.]" *Id*.

Thus, in addition to affirming the trial court order establishing Junior's parentage based on contract principles, we affirm it upon our application of the principles of intent-based parentage that the concurring justices highlighted in **C.G.** Stated plainly, this appeal is the paradigm of intent-based parentage in cases involving ART, where the couple not only evidenced their mutual intent to conceive and raise the child, but they also participated jointly in the process of creating a new life.

Order affirmed.

Judges Olson, Dubow, Kunselman, McLaughlin, and McCaffery join this Opinion.

P.J. Panella and Judge Murray concur in the result.

Judge King files a Concurring Opinion in which P.J. Panella and Judge Murray join.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/11/2023